**STRATTEC SECURITY CORPORATION,**
**Plaintiff–Appellee,**

v.

**GENERAL AUTOMOTIVE SPECIALTY COMPANY, INC. and All–Lock Company, Inc., Defendants–Appellants.**

**No. 96–1024.**

United States Court of Appeals,
Federal Circuit.

Sept. 16, 1997.

Robert C. Curfiss, Butler & Binion, L.L.P., Houston, TX, argued, for plaintiff–appellee. With him on the brief was Louis Paine.

Peter C. Schechter, Darby & Darby, P.C., New York City, argued, for defendants–appellants. With him on the brief was Ira Jay Levy.

Before RICH, NEWMAN, and MAYER, Circuit Judges.

RICH, Circuit Judge.

General Automotive Specialty Company, Inc. and All–Lock Company, Inc. (collectively

General Automotive) appeal from two decisions of the U.S. District Court for the Southern District of Texas: (1) a judgment that General Automotive's after-market automobile key literally infringes Strattec Security Corporation's (Strattec's) U.S. Patent No. 4,250,482 entitled "Packaged Electronic Component and Method of Preparing the Same" (the '482 patent); and (2) an order that General Automotive must pay a portion of Strattec's attorney fees because the jury found the infringement to be willful. *Strattec Security Corp. v. General Automotive Specialty Co.,* No. H–95–1031 (S.D. Tex. 16 Aug. 1995 and 19 Sept. 1995). We reverse.

## BACKGROUND

In 1978, General Motors Corporation (GM) asked the Allen–Bradley Company (A–B) to make a commercially manufacturable pellet resistor for mounting in the shank, or long portion, of the ignition keys to cars equipped with GM's Vehicle Anti–Theft System (VATS).[1] The VATS keys are designed so that a resistor mounted in the shank of the key will operatively engage an electrical circuit when the key is inserted into a car's VATS-equipped ignition system. The electrical circuit includes an on-board computer that temporarily disables the car's electronic ignition system if the resistance value of the key's resistor does not match a predetermined value.

In response to GM's request, A–B developed and patented a packaged resistor. A–B's patent, the '482 patent, issued 10 Febru-

ary 1981 and is the subject of this lawsuit. Although originally assigned to A–B, the patent was assigned to plaintiff-appellee Strattec on 27 February 1995. Strattec is the original equipment supplier of the GM VATS keys currently used in GM cars.

While Strattec's VATS keys do incorporate a pellet resistor like that covered by the '482 patent, the patent itself is not directed to keys, VATS or otherwise, and does not include the words "key," "ignition cylinder," "vehicle," "car," "automobile," "steering column," or "vehicle anti-theft system." The '482 patent is directed to a resistor assembly. According to the '482 patent's Summary of Invention, the assembly comprises an electronic chip encapsulated in a small package with runner-like leads (e.g., small enough to fit inside a standard GM ignition key). Figure 3b from the '482 patent illustrates the preferred embodiment and is provided below.

In the preferred embodiment, a sheet metal lead frame 16 (e.g., a perforated ribbon) has internal termination pads 14 and 14' formed by a punching or stamping operation. An electronic chip 13, such as a chip resistor or integrated circuit, is soldered to the termination pads 14 and 14'. This assembly is then over-molded with plastic 11 to produce the packaged component as depicted in Fig.3d from the patent. The packaged component is subsequently separated from the sheet of metal, and the exterior runner-like leads 12 and 12' are simultaneously shaped by a trimming operation to produce the finished encapsulated component 10 shown in figures 1 and 2 of the patent.

---

1. GM's VATS is covered by Patent No. 4,148,372, which is not at issue in this case.

**Fig. 3b of the '482 Patent**

**Figure 3d of the '482 Patent**

**Figure 1 of '482 Patent**

**Figure 2 of the '482 Patent**

The lead frame 16 thus conducts electricity, supports the electronic chip 13, and forms runner-like leads 12 and 12'. As used in Strattec's VATS key, the encapsulated chip is inserted in a key shank and mounted in a defined orientation so that a runner-like lead protrudes on each side of the shank.

Strattec filed this lawsuit on 6 April 1995 against General Automotive, which had just introduced its own after-market VATS key designed to work in GM's VATS-equipped cars. General Automotive has been in the business of after-market supply of replacement products, such as switches and locks, for many years. The product Strattec accuses of infringing the '482 patent is General Automotive's complete VATS key (as shown below), which includes a metal key blank, a resistor assembly, and an over-molded plastic cover enclosing the head and part of the shank of the key blank as well as the entire resistor assembly except for the contact areas.

The resistor assembly (shown below) comprises a molded plastic contact carrier, a cylindrical resistor with axial leads, and two contacts formed of bent round wire. The contact carrier holds the resistor and its leads in their respective positions. Each of the resistor leads is then wrapped around and soldered to an end of its respective contact wire.

General Automotive's complete VATS key

VATS KEY ASSEMBLY

General Automotive's resistor assembly

RESISTOR ASSEMBLY

During manufacture, the resistor assembly is placed in an opening in the metal key blank. The opening is located mainly in the head portion of the key and extends part way down the key shank. The entire head of the key as well as the resistor assembly, save for the protruding wire contacts at its ends, are then embedded in plastic in an injection molding process.

General Automotive's initial design, which was never reduced to prototype or manufactured, used a conventional, cylindrical resistor with axial leads that was held in a plastic contact carrier with two contact strips of sheet metal fastened to the plastic carrier.

Before the design was completed, however, General Automotive's patent counsel advised it that A–B had relied on the use of sheet metal to get the application for the '482 patent allowed. In response, General Automotive changed from sheet metal contacts to round wire contacts, thereby eliminating any use of sheet metal parts.

After a trial held from 18–27 July 1995, the jury found that the '482 patent was not invalid, either for anticipation or obviousness, and that, applying the district court's "claim meanings," General Automotive literally infringed claims 1, 2, 3, 4, and 6 of the patent by manufacturing and selling its after-market VATS key. The district court instructed the jury that it need not reach infringement under the doctrine of equivalents if it found literal infringement. The jury also found "clear evidence" that General Automotive's infringement was willful. The district court entered a final judgment on 16 August 1995. General Automotive filed a post-verdict motion for a new trial which, in part, challenged the sufficiency of the evidence. The district court denied this motion and subsequently awarded Strattec a portion of its attorney fees based solely on the jury's finding of willfulness. This appeal followed.

We first address whether General Automotive's after-market VATS keys literally infringe either of independent claims 1 or 6 of the '482 patent. Dependent claims 2–4 need not be considered in this appeal since, as discussed below, independent claims 1 and 6 contain the significant limitations. *See Atlanta Motoring Accessories, Inc. v. Saratoga Tech., Inc.,* 33 F.3d 1362, 1364, 31 USPQ2d 1929, 1930 (Fed.Cir.1994). Strattec did not assert infringement of dependent claim 5. We then consider infringement under the doctrine of equivalents. Finally, we review the jury's finding of willfulness and the district court's award of attorney fees, which is based on that finding.

### LITERAL INFRINGEMENT

 Analysis of patent infringement involves two steps: (1) claim construction to *determine the scope of the claims,* followed by (2) determination of whether the properly construed claims encompass the accused structure. *Carroll Touch, Inc. v. Electro*

*Mechanical Sys., Inc.,* 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). The first is a question to be determined by the court. *See Markman v. Westview Instruments, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1384, 1387, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1463 (1996) ("We hold that the construction of a patent, including terms of art within its claim, is exclusively within the province of the court."). The second is a question of fact, to be submitted to a jury. *See Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1520, 35 USPQ2d 1641, 1647 (Fed.Cir.1995) (in banc), *reversed and remanded on other grounds,* —— U.S. ——, 117 S.Ct. 1040, 137 L.Ed.2d 146, 41 USPQ2d 1865 (1997) (citing *Winans v. Denmead,* 56 U.S. (15 How.) 330, 338, 14 L.Ed. 717 (1853); *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1125, 227 USPQ 577, 589 (Fed.Cir.1985) (in banc)).

### A. Claim Construction

Claims 1 and 6 are the only independent claims of the '482 patent, and they read as follows (emphasis and reference numerals to the figures of the '482 patent are added)

1. A packaged electronic component includes an insulating body (11), an *electronic chip* (13) disposed within the insulating body and having a pair of terminals (13a, 13b), and two members of *conductive sheet material* (14, 15, 12' and 14', 15', 12) which connect to opposite terminals (13a, 13b), the two members extending laterally from said terminals to the outside of the insulating body and forming a pair of *runner-like leads* (12, 12') that terminate said laterally extending members.

6. A packaged electronic component that is made of *only four elements,* the component including:

an insulating body (11);

an *electronic chip* (13) disposed within the insulating body and having a pair of terminals (13a, 13b); and

a *pair of electrically conductive sheet-like members* (14, 15, 12' and 14', 15', 12), each member having a first section that extends inwardly into the insulating body and is electrically connected to a respective terminal of the electronic chip, and each member having a second section that extends outside the insulating body and pro-

vides a *runner-like lead* (12, 12') that facilitates the making and breaking of sliding electrical contact with a respective one of a pair of stationary contacts.

The district court rejected the claim construction offered by the parties and construed the claims itself. The court provided the jury with its "claim meanings" at the conclusion of the trial as part of its Special Instructions and Interrogatories. General Automotive objected to these instructions, and the district court overruled those objections. As discussed in the next four subsections, we cannot agree with the district court's claim construction.

### 1. "Sheet" and "Sheet-like"

■ The parties contend that the proper construction of claim terms "members of conductive sheet material" (claim 1) and "electrically conductive sheet-like members" (claim 6) is critical to this appeal. We agree. The pertinent portion of the district court's "claim meanings" reads as follows (emphasis added):

" Sheet" or "sheet-like" mean conductive material that can be shaped to furnish electrical contact between the resistor and the outside contact in the steering column and can be shaped into contacts with a long dimension along the axis of the key. The use of the sheet *in the claims* merely shows the advantages of that method and *is not a part of the claim.*

The district court erred when it instructed the jury that the use of the term "sheet" is "not a part of the claim." The claimed "members of conductive sheet material" (claim 1) and "electrically conductive sheet-like members" (claim 6) are clearly limitations of the claims. Although the claims themselves do not define the terms "sheet" and "sheet-like," the specification variously refers to "sheet metal," "flat sheet metal," "conductive sheet metal," and "electronically conductive sheet metal." In addition, the applicants added the references to "sheet" and "sheet-like" to the independent claims in their response to the first examiner's action. This is apparent from the following example, which is the result of our comparison between originally filed claim 1 and issued claim 1 (text that is present in the issued claim but absent from the original claim is underlined and text that is absent from the

issued claim but present in the original claim is bracketed):

A packaged electronic component includes an insulating body, [completely enclosing] an electronic chip *disposed within the insulating body and* having *a pair of* terminals, *and two members of conductive sheet material which connect to opposite terminals, the two members extending laterally from said terminals to the outside of the insulating body* and *forming* a pair of runner-like leads *that terminate said laterally extending members* [which are electrically connected to the terminals of the chip and which extend outwardly from said body, said leads being particularly adapted for making and breaking sliding electrical contact with stationary contacts in an electronic circuit].

As may be seen, the added limitations more particularly define how the terminals of the electronic chip are electrically connected to the runner-like leads. In their amended claim, the applicants made it clear that conductive sheet material connects to the terminals of the electronic chip and forms the runner-like leads. Similar limitations were added in the other independent claim that eventually issued as independent claim 6.

Importantly, the applicants also specifically relied on these new limitations in the remarks portion of their first amendment. They distinguished the teachings of U.S. Patent No. 3,808,506, which describes wire leads electrically connecting circuit elements to button contact pads, by arguing that in their claimed invention the electrical connection between the electronic chip and the runner-like leads is provided by members of conductive sheet material, as opposed to wire leads, extending laterally from the terminals of the electronic chip to the outside of the insulating body.

A review of the '482 patent and its prosecution history reveals that the terms "sheet" and "sheet-like" do not have any special meanings in the art and that the '482 inventors used these terms in their ordinary, everyday sense, i.e., to describe something flat with a fairly broad surface relative to its thickness. The claims thus include within their literal scope only devices with conduc-

### 2. "Runner-like Leads"

■ The proper construction of the claim term "runner-like leads" is also important to this appeal. Here, the district court provided the jury with the following "claim meaning" (emphasis added):

" Runner" or "runner-like" means having a long dimension to furnish a greater likelihood of the key's contact touching the contact with the steering column. This is what in part distinguished the patented thing from the prior art showing a point or small circular contact. The line along which the *round wire* touches the steering column contact is a "long dimension". The sheet has two long dimensions, width and breadth, and its narrow dimension, height, becomes the width of the line that can complete the circuit, like the line contact made by the *wire*. The sheet could be made thin enough that its contact area was no different from the *round wire's*.

After reviewing the specification and prosecution history, we hold that the district court erred in construing the "sheet" to be no different from a "round wire" that was simply thinned. The dispositive distinction over the prior art was the use of sheet metal instead of round wire. This distinction could not be eliminated by "construing" the terms "sheet" and "round wire" as "not different."

### 3. "Electronic Chip"

The district court provided the jury with the following construction of "electronic chip" (emphasis added):

"Chip" is not used in whatever technical sense it may have; here, it means the same thing as an electrical component, whether it is a complex integrated circuit of several subparts or a single resistor. A resistor itself is made of two leads, case, and resistant core, at a minimum, making it a packaged electronic component.

Although we do not agree with the district court's construction, for it appears from the definition given to the jury that the district court was confusing a "packaged electronic component" (i.e., the claimed invention as a whole) with an "electronic chip" (i.e., an ele-ment of the claimed invention), this aspect does not appear to have been material to the result, and any error appears to have been harmless.

### 4. "Only Four Elements"

■ The district court provided the jury with the following construction of "only four elements":

" Only four elements" is another illustration of the advantages of the patented thing, but unnecessarily dividing a single component into two does not necessarily keep a five-part thing from infringing.

While a five-part component might be equivalent to a four-part component, they never can be literally the same. It is not clear from the instruction whether the district court was directing this explanation to the doctrine of equivalents. However, at the trial the experts for both sides, and counsel in argument, drew this distinction and explained it to the jury.

While prosecuting the application that led to the '482 patent, the applicants not only added "only four elements" to the preamble of what became claim 6, but also argued that the simplicity of this construction made it novel and nonobvious over the cited references, none of which showed such an easily manufactured packaged component. Consequently, we find this prosecution history important in determining the effect of the "only four elements" portion of claim 6. The applicants were clearly arguing that these words were significant to the claim. Since to literally infringe claim 6 an accused device must have only four elements, no reasonable jury could have found infringement.

## B. Literal Infringement

■ Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device, i.e., when the properly construed claim reads on the accused device exactly. *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1384 (Fed.Cir.1989) (citing cases). *Hilton Davis* reiterated that, where infringement is tried to a jury, "an appellate court reviews the jury verdict for lack of substantial evidence." *Hilton Davis*, 62 F.3d at 1521, 35

USPQ2d at 1647 (citing *Genentech, Inc. v. Wellcome Found. Ltd.,* 29 F.3d 1555, 1565, 31 USPQ2d 1161, 1168–69 (Fed.Cir.1994)). We owe no deference, however, to a jury verdict reached upon an improper claim construction when, as is the case here, the correct construction of the claims is dispositive of the issue of infringement. *See Jurgens,* 927 F.2d 1552, 18 USPQ2d 1031; [2] *Hoechst,* 78 F.3d at 1578, 38 USPQ2d at 1128.

■ Under the proper claim construction, no reasonable jury could find literal infringement since the independent claims do not literally read upon General Automotive's accused keys. Not every element of independent claims 1 and 6 can be found in the accused keys. General Automotive's keys do not, for example, literally meet the "conductive sheet material" limitation in claim 1 or the related "conductive sheet-like members" limitation in claim 6; nor are they limited to the four elements required by claim 6.

Since the accused keys do not meet all of the claim limitations, we hold that General Automotive does not infringe either independent claim by manufacturing and selling its accused keys. Remand on this issue is not necessary.

### C. Infringement Under the Doctrine of Equivalents

The jury did not reach the issue of infringement under the doctrine of equivalents, and we cannot make this factual finding in the first instance on appeal. *See Hilton Davis,* 62 F.3d at 1521, 35 USPQ2d at 1647 ("[I]nfringement under the doctrine of equivalents is an issue of fact.").

■ General Automotive asserts that Strattec waived its right to a jury trial on the issue of infringement under the doctrine of equivalents. We do not agree. The jury did not reach the issue because the jury was

instructed not to decide equivalency if it found literal infringement. This does not constitute waiver.

■ However, the prosecution history requires that the use of round wires, shown in the prior art, is not equivalent to the use of sheet-like leads. We therefore conclude that no reasonable jury could find otherwise, based upon correctly construed claims, with due consideration of the prior art and the estoppel that results from the prosecution history in this case.

## WILLFULNESS AND ATTORNEY FEES

■ On appeal, we have also been asked to decide whether the jury properly found by clear and convincing evidence that General Automotive's infringement was willful, and whether the district court properly exercised its discretion pursuant to 35 U.S.C. § 285 to award Strattec a portion of its attorney fees.

The jury finding of willfulness cannot stand. Even the district court expressed reservations about the jury's willfulness finding. Since we hold that the properly construed claims of the '482 patent cannot literally be read upon General Automotive's accused keys, the jury clearly could not have correctly found willful infringement.

The district court's award of attorney fees must be vacated. Section 285 reads, in pertinent part, "the court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285 (1994). The court's exceptional-case analysis consists of one sentence: "Strattec takes $96,209.00 in attorneys' fees from General Automotive based only on the jury's finding of willfulness." No precedent of this court upholds a finding that a case is exceptional within the meaning of § 285 where the district court

---

**2.** In *Jurgens,* after a jury found, inter alia, that defendants infringed the plaintiffs' patent, the defendants moved for JNOV and for a new trial on the patent claims. 927 F.2d at 1556, 18 USPQ2d at 1034. The district court rejected the defendants' JNOV motion because they had failed to move for directed verdict at the close of all the evidence, and denied their alternative motion for a new trial. *Id.,* 927 F.2d at 1557, 18 USPQ2d at 1035. The defendants appealed. This court held that the district court had properly rejected the defendants' JNOV motion. *Id.* at

1557, 18 USPQ2d at 1035. "Nonetheless, [the defendants] may challenge the judgment below on the ground that the judge committed an error of law or abused his discretion." *Id.* (citing *Smith v. Ferrel,* 852 F.2d 1074, 1077 (8th Cir. 1988); *Hubbard v. White,* 755 F.2d 692, 694 (8th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985)). This court then held that, based upon its de novo claim construction, there was no literal infringement as a matter of law. *Id.* at 1560–61, 18 USPQ2d at 1037–38.

based the award only on willfulness and where we do not uphold the willfulness finding on appeal.

### CONCLUSION

For the above reasons, we hold that the jury's finding of literal infringement was based upon an erroneous claim construction. Applying the proper claim construction, no reasonable jury could find infringement of the '482 patent by General Automotive, either literally or equivalently. Therefore, we reverse the final judgment of infringement entered 16 August 1995. Since we hold as a matter of law that there is no infringement, the jury's finding of willfulness also falls. We thus vacate the post-judgment order entered 19 September 1995 awarding Strattec part of its attorney fees based solely upon the jury's finding of willfulness.

### COSTS

Each party shall bear its own costs.

*REVERSED.*