**ENERCON GmbH and The New World Power Corporation, Appellants,**

v.

**INTERNATIONAL TRADE COMMISSION,**
**Appellee,**

and

**Zond Energy Systems, Incorporated, Intervenor.**

**No. 97–1554.**

United States Court of Appeals, Federal Circuit.

Aug. 12, 1998.

Mary Helen Sears, The M.H. Sears Law Firm Chartered, Washington, DC, argued, for appellants. With her on the brief was Thomas S. Hahn. Of counsel was Howard E. Susman, Hillyer & Irwin, San Diego, CA.

Andrea C. Casson, Attorney–Advisor, Office of the General Counsel, U.S. International Trade Commission, Washington, DC, argued, for appellee. With her on the brief were Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, and John A. Wasleff, Attorney.

Joel M. Freed, Howrey & Simon, Washington, DC, argued, for intervenor. With him on the brief were Therese K. Francese and Cecil E. Key, Jr. Also on the brief was William J. Griffin, Nixon & Vanderhye P.C., Arlington, VA.

Before NEWMAN, Circuit Judge, SMITH, Senior Circuit Judge, and GAJARSA, Circuit Judge.

GAJARSA, Circuit Judge.

This appeal relates to an investigation initiated by the United States International Trade Commission (ITC) under section 337 of the Tariff Act of 1930 as amended, 19 U.S.C. § 1337 (1994), based on a complaint filed by Kenetech Windpower, Inc. (Kenetech). Kenetech's complaint before the ITC alleged that Enercon GmbH (Enercon) and New World Power Corp. (NWP) planned to import into the United States certain variable wind turbines that infringed Kenetech's U.S. Patent No. 5,083,039 (the. '039 patent). On August 30, 1996, the administrative law judge made an initial determination that Enercon had violated section 337 by selling for importation variable wind turbines that infringed claim 131 of the '039 patent and issued an order excluding Enercon's variable wind turbines from entry into the United States until the expiration of the '039 patent. The initial determination and exclusion order became final on October 28, 1996. Enercon appeals from the final exclusion order, Inv. No. 337–TA–376, entitled *Certain Variable Speed Wind Turbines and Components Thereof*,[1] challenging the ITC's determination that it had jurisdiction in this case. Enercon also appeals certain aspects of the ITC's construction of claim 131 of the '039 patent. Because the ITC did not err in its determination that it had jurisdiction under section 337 and that Enercon's wind turbines infringed the '039 patent, we affirm the determination of the ITC.

## BACKGROUND

### A. The Technology

The '039 patent concerns a method of converting wind power into electrical power usable by an electric utility company. A wind turbine converts wind energy to electrical energy by using a wind-driven turbine in combination with an alternating current (AC) induction generator. As the wind turns the blades of the turbine, the rotor of the AC induction generator is activated, thereby generating electricity. In a variable speed wind turbine, the frequency of the generated power waveform depends upon the wind speed. The stronger the wind, the faster the turbine blades turn, and the greater the frequency of

---

1. The '039 patent formed the basis of Kenetech's complaint before the ITC. After the investigation was completed, and Enercon appealed the ITC's final exclusion order of October 28, 1996, the '039 patent was acquired by Zond Energy Systems, Inc., which was substituted for Kenetech in this appeal.

the generated power waveform. In North America, electrical utilities must deliver power to their customers at a standard constant frequency of 60 Hz. Therefore, the frequency of the power generated by the variable speed wind turbine must be continually adjusted to match this standard in order for the turbine to be able to contribute electrical power to the utility power grid. In addition, the converter must also closely match the "phase" of the utility power. The "phase" of a waveform refers to the points in time at which the sinusoidal wave reaches its positive and negative peaks. Even if the frequencies of the generated power and the utility power are equal, maximum power will not be delivered to the utility grid unless the phases also match. Essentially, the peaks and valleys must be matched so that the generated power constructively adds to the utility power at all times.

If the waveforms for both the voltage and current are in phase with one another, all of the power delivered by the generator is composed of "real" or usable power. If the voltage and current waveforms are out of phase with one another, a portion of the overall power consists of "reactive" power depending upon the degree to which the waveforms are out of phase. The degree to which the waveforms are out of phase is referred to as the "power factor angle" and is commonly denoted by the Greek letter phi ( ).

Utility companies generally attempt to deliver power that is completely in phase in order to maximize the real power available to their customers. However, inductive loads on a utility power grid can sometimes pull the current waveform out of phase with the voltage waveform. It is therefore desirable to "pre-correct" this distortion by providing a waveform that either leads or lags the waveform on the utility grid in order to counteract this effect. By changing the power factor angle phi, it is possible to both match the phase of the utility grid and to also adjust the amount of real and reactive power in the system to counteract the effect of inductive loads.

The '039 patent was issued on February 1, 1991. Claim 131 of the '039 patent, the only claim at issue in this appeal, is directed to a method for controlling the AC power output from a wind turbine to achieve a preselected power factor angle that is compatible with that of an electric utility grid. Claim 131 reads as follows:

A method for converting electricity generated by a variable speed wind turbine into fixed frequency output electricity, wherein the wind turbine includes a generator and means for supplying generated electricity to [a] power converter that includes a switched inverter supplying the output electricity, the method comprising the steps of:

forming a reference waveform;

rotating the reference waveform by a selected power factor angle to yield a template waveform;

using the template waveform to define desired output currents; and

controlling the switched inverter to produce output currents corresponding to the desired output currents.

According to the written description of the '039 patent, the variable frequency AC produced by the generator is converted to fixed frequency AC by using a power converter that includes active rectifiers for first converting the variable frequency AC to DC. The power converter also includes a switched inverter for converting DC back to AC. An inverter control unit further controls the switched inverter to supply power to the utility power grid with an adjustable phase. The power factor angle is adjusted so that the current supplied by the generator system is in phase with the voltage on the utility lines. Alternatively, the phase of the current supplied by the generator may be adjusted to lead the voltage in the utility lines in order to compensate for inductive loads at other points in the utility grid.

Claim 131 primarily concerns the manipulation of the current and voltage waveforms output from the power converter. The written description explains that the invention first forms a reference waveform by sampling the waveform on the grid. The claimed invention then rotates this waveform by a preselected power factor angle to generate a

"template" or "model" waveform. The claimed invention then uses the switched inverter to control the output waveform from the power converter to match the template waveform as closely as possible.

## B. The ITC's Jurisdiction Under Section 337

Section 337 lists the requirements for the ITC's jurisdiction. In particular, section 337 requires an "importation" or a "sale for importation" before the ITC may exercise jurisdiction over any accused goods. The ITC found a long and well established course of conduct between Enercon and NWP that demonstrated that there had been a contract for sale of Enercon's model E–40 variable wind turbines to NWP for importation into the United States, thereby bringing the turbines within its jurisdiction under section 337.

In 1993, NWP wrote to Enercon to request a price quote for a specific number of model E–40 variable wind turbines in connection with a project planned in the state of Washington. Enercon responded on August 18, 1993 with a written offer to sell NWP the E–40 wind turbines at a specific price per turbine, to be delivered on the west coast of the United States. The offer stated that it would remain open until March 31, 1994 and was signed by several of Enercon's officers. The ITC found that while this particular offer was not accepted, it did establish a set price per turbine when sold in the stated quantity. Following several meetings between Enercon and NWP, Enercon sent NWP a letter on February 15, 1994 stating that "[w]e once again would like to point out that we will be prepared to fulfill your requirements starting in 1995 . . . ."

On February 28, 1994, NWP submitted a bid on a project for Texas Utilities (TU) in Big Spring, Texas. In the bid, NWP stated an intention to use Enercon's E–40 variable wind turbines. In the ensuing months there were several meetings between NWP and Enercon, ostensibly to discuss the E–40 turbines and their use in the Big Spring project. On June 1, 1994, Enercon's U.S. affiliate reported in a faxed memorandum that the entire Big Spring project would likely be awarded to NWP and that Enercon needed to deliver the turbines. On June 3, 1994, an internal Enercon memorandum reported that the Big Spring project was indeed awarded to NWP and that Enercon was listed as providing the turbines for the project.

In September, 1994, NWP signed an energy purchase agreement with TU, the sponsor of the Big Springs project. The agreement specified that all wind turbines would be Enercon's model E–40 turbines. Near the end of 1994, Enercon investigated the cost involved in shipping the E–40 turbines from Germany to Big Spring, Texas. Finally, at the American Wind Energy Association conference, which took place in March 1995, the NWP booth at the conference displayed posters depicting Enercon's E–40 turbine and described its expected use in the forthcoming Big Spring project.

The ITC found that these activities, combined with the initial offer to provide the turbines at a specific price per machine, demonstrated that a contract had been formed between Enercon and NWP for the sale of the E–40 turbines. Having found a contract for sale and importation into the United States, the ITC consequently found that it had jurisdiction under section 337 to determine whether the Enercon E–40 turbines infringed the '039 patent as alleged by Kenetech. Based upon the claim construction and comparison to the accused device, the ITC found that Enercon's E–40 turbines, if imported into the United States, would infringe claim 131 of the '039 patent and accordingly ordered the exclusion of the E–40 and similar turbines from importation into the United States until the expiration of the '039 patent.

## DISCUSSION

### A. ITC Jurisdiction Under Section 337

■ This court has exclusive jurisdiction over "final determinations of the United States International Trade Commission relating to unfair practices in import trade made under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337)." 28 U.S.C. § 1295(a)(6) (1994); see also 19 U.S.C. § 1337(c) (1994). This court reviews a final determination of the ITC in accordance with Chapter 7 of the

Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706 (1994). *See* 19 U.S.C. § 1337(c). Accordingly, we review factual findings of the ITC under the "substantial evidence" standard. *See Checkpoint Sys., Inc. v. United States Int'l Trade Comm'n,* 54 F.3d 756, 759, 35 USPQ2d 1042, 1045 (Fed. Cir.1995). The "substantial evidence" standard is satisfied by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. National Labor Relations Bd.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

■■■ As the agency charged with the administration of section 337, the ITC is entitled to appropriate deference to its interpretation of the statute. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Farrel Corp. v. United States Int'l Trade Comm'n,* 949 F.2d 1147, 1151, 20 U.S.P.Q.2d 1912, 1916 (Fed.Cir.1991) ("While this court generally reviews ITC interpretations of statutory provisions de novo, some deference to constructions by the agency charged with its administration may be appropriate, particularly if technical issues requiring some expertise are involved."); *Texas State Comm'n for the Blind v. United States,* 796 F.2d 400, 406 (Fed.Cir.1986) ("The issue to be decided by this court is whether the statute is capable of more than one interpretation and whether the agency's interpretation is reasonable."). Under the *Chevron* decision, we are directed to determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778. Where the statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778 (footnote omitted). This court will therefore uphold the ITC's interpretation of section 337 if it is reasonable in light of the language, policies and legislative history of the statute. *See Corning Glass Works v. United States Int'l Trade Comm'n,* 799 F.2d 1559, 1565, 230 USPQ 822, 826 (Fed.Cir.1986). In addition, we review the ITC's factual determinations of whether the various jurisdictional provisions of the statute have been met in this case to determine if they are supported by substantial evidence.

Section 1337(a)(1)(B) of title 19 of the United States Code deems unlawful "[t]he importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States patent." The ITC concluded that the term "sale" in section 337 is properly defined as including contracts for sale in light of Uniform Commercial Code (U.C.C.) § 2–106(1). The ITC then found that Enercon and NWP had entered into a contract for sale of the E–40 wind turbines, thereby bringing those devices within its jurisdiction under section 337.

■■■ Enercon first argues that the ITC's exclusion order should be vacated because it lacks jurisdiction over the accused goods under 19 U.S.C. § 1337(a)(1)(B). Enercon claims that no "sale for importation" within the meaning of section 337 has occurred to give the ITC jurisdiction over its variable speed wind turbines. Enercon argues that the ITC erroneously based its interpretation of the term "sale" in section 337 upon the definition of "sale" in U.C.C. § 2–106(1) and that the ITC should have interpreted the term "sale" to require a "delivery" of the goods to the purchaser. Enercon asserts that under this more restrictive definition of "sale," the ITC does not have jurisdiction over Enercon's wind turbines since there was never a "delivery" of the turbines to NWP.

As the ITC correctly pointed out, the term "sale" is not defined within section 337. There is also no explicitly stated definition of the term "sale" in the legislative history of section 337. We therefore believe that Congress intended to give the term its ordinary meaning, thereby making an explicit definition unnecessary.

*Black's Law Dictionary* defines the term "sale" as "[a] contract between two parties, called, respectively, the 'seller' (or vendor) and the 'buyer' (or purchaser), by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and the possession of the property." *Black's Law Dictionary* (6th ed.1990). *Webster's Dictionary* defines the term "sale" as "the act of selling: a contract transferring the absolute or general ownership of property from one person ... to another for a price...." *Webster's Third New International Dictionary* 2003 (1986). Plainly, the common, or usual meaning of the term sale includes those situations in which a contract has been made between two parties who agree to transfer title and possession of specific property for a price.

The U.C.C. has been recognized as the general law governing the sale of goods and is another useful, though not authoritative, source in determining the ordinary commercial meaning of the term "sale." Section 2–106, which defines the various terms used throughout the U.C.C., states that a " '[c]ontract for sale' includes both a present sale of goods and a contract to sell goods at a future time." Section 2–106 further states that a " 'present sale' means a sale which is accomplished by the making of the contract." *Id.* Therefore, the U.C.C. is in accordance with the above referenced dictionaries in defining the term "sale" as having been accomplished when a contract for the transfer of goods has been completed. There is nothing in section 337 to contradict this interpretation.

Enercon argues that the term "sale" as used in section 337 inherently requires that title in specific goods pass from the buyer to the seller and that without such "delivery" of the goods, no "sale" within the meaning of section 337 has occurred. In particular, Enercon reads the phrase "[a] sale consists in the passing of title in specific existing goods from the seller to the buyer for a price" in section 2–106 as requiring a "delivery" of control of the goods to a U.S. domiciliary desiring to import them, even if the goods are not physically sent to the buyer. Thus, Enercon argues that before the ITC may

assume jurisdiction under the phrase "sale for importation," there must be: 1) delivery of title and control of the goods to the buyer; and 2) a buyer who is a U.S. domiciliary intending to import the goods into the U.S. We detect no such restrictions on the term "sale." It is common for a "sale" to be completed even though delivery is to be made in the future. As Enercon cites in its brief, this court has previously stated, albeit in the context of interpreting the "on sale bar" of 35 U.S.C. § 102(b), that "[i]t is well settled that a sale is a contract between parties to give and to pass rights of property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold." *In re Caveney,* 761 F.2d 671, 676, 226 U.S.P.Q. 1, 4 (Fed.Cir.1985). The term "sale" in section 337 therefore does not require an immediate "delivery" of the goods in order for the ITC to assume jurisdiction.

Further, the ITC's construction of the phrase "sale for importation" is not inconsistent with the legislative history of section 337, as suggested by Enercon. Prior to 1988, section 337 read as follows:

Unfair methods of competition and unfair acts in the importation of articles into the United States or in their sale by the owner, importer, consignee or agent of either ... are declared unlawful,....

Tariff Act of 1930, § 337, 46 Stat. 703 (1983).

The pre–1988 version of section 337 did not contain the provision prohibiting a "sale for importation." Congress amended this section to add the phrase "sale for importation" in 1988. The Conference Report explains that the addition of this language was not intended to change the interpretation of the statute. "In changing the wording with respect to importation or sale, the conferees do not intend to change the interpretation or implementation of current law as it applies to the importation or sale of articles that infringe certain U.S. intellectual property rights." H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 633 (1988). Rather, the 1988 amendments were intended to strengthen the statute's effectiveness in eliminating the problems caused by the importation of goods that infringe U.S. intellectual property

rights. *See* S. Rep. 71, 100th Cong., 1st Sess. 128 (1987); *see also* H.R. Conf. Rep. No. 576, 100th Cong., 2d Sess. 112 (noting that "the purpose of [the amendments] is to make [section 1337] a more effective remedy for the protection of United States intellectual property rights."). Thus, contrary to Enercon's assertion, we believe that in passing the 1988 amendments to section 337, Congress did not intend to weaken the ability of the ITC to prevent unfair acts by including an additional limitation on its jurisdiction. Further, we reject Enercon's contention that in the 1988 amendments to section 337 Congress intended to separate accused infringement of intellectual property rights covered by subsections (b), (c) and (d), from the general class of unfair acts covered by subsection (a).

We have also considered Enercon's argument that delivery of control of the goods to a U.S. domiciliary intending to import them into the U.S. is necessary in order satisfy the "minimum contacts" requirement for *in rem* jurisdiction and find it to be without merit. It is clear that neither the language of section 337, nor traditional "minimum contacts" analysis inherently limits the jurisdiction of the ITC to situations in which there has been a delivery of control of the goods to a U.S. domiciliary intending to import them into the United States.

The ITC's determination that the phrase "sale for importation" includes the situation in which a contract for goods has been formed in accordance with section 2–204(1) of the U.C.C. is a reasonable interpretation of 19 U.S.C. § 1337 that we must uphold under the standards set forth by the Supreme Court in *Chevron*. We must next review whether substantial evidence supports the ITC's finding that a contract has been formed between Enercon and NWP for the sale of the accused goods thereby bringing those goods within the jurisdiction of the ITC under section 337.

■ Section 2–204(1) of the U.C.C. provides that "a contract for [the] sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract ... even though the moment of its making is undetermined." The ITC found that the writings and conduct of Enercon and NWP demonstrated, by more than a preponderance of the evidence, that NWP and Enercon had entered into a contract for the sale of Enercon's wind turbines for importation into the United States. In support, the ITC pointed to compelling evidence that NWP bid on the Big Springs project using the price quoted to it by Enercon and specifically stated that it would use Enercon's E–40 wind turbines. The ITC also found persuasive Enercon's documents that demonstrated an intent to deliver the turbines to NWP once Enercon learned that NWP's bid on the Big Springs project had been accepted by TU.

The ITC concluded from the totality of the written documentation and contemporaneous conduct by the parties that there was a clear intent by both Enercon and NWP to enter into a contract for the sale of Enercon's E–40 wind turbines. Enercon argues that the ITC failed to consider evidence that in late 1995, after the ITC began its investigation of Enercon, Enercon's managing director, Mr. Wobben, orally informed NWP that Enercon would not supply NWP with wind turbines for the Big Springs project. Enercon argues that this statement effectively cancelled any oral contract that may have been formed, thereby precluding the ITC from assuming jurisdiction in this case. The ITC plainly considered this evidence, but rejected Enercon's assertion, explaining that despite this statement, the evidence did not support a conclusion that Enercon would refrain from sending the accused products into the United States. In addition, this evidence is directly contrary to the deposition testimony of Mr. John Kuhns who stated that Mr. Wobben never indicated that he would not supply the wind turbines to NWP. We believe that the evidence presented fully supports a conclusion that a contract had been formed between Enercon and NWP, thereby bringing the accused devices within the ITC's jurisdiction under section 337. We therefore affirm the determination of the ITC that it had jurisdiction over the accused wind turbines.

## B. Literal·Infringement

■■ In determining whether there has been literal infringement, a two step analysis is required. First, the claims must be correctly construed to determine the scope of the claims. Second, the claims must be compared to the accused device. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976, 34 U.S.P.Q.2d 1321, 1326 (Fed.Cir.1995) (in banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 U.S.P.Q.2d 1461 (1996); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1581–82, 39 U.S.P.Q.2d 1573, 1576 (Fed. Cir.1996). To establish literal infringement, a plaintiff must demonstrate that every limitation in the claim is literally met by the accused device. *See Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1388–89, 21 U.S.P.Q.2d 1383, 1387 (Fed.Cir.1992); *Key Mfg. Group, Inc. v. Microdot, Inc.,* 925 F.2d 1444, 1449, 17 U.S.P.Q.2d 1806, 1810 (Fed. Cir.1991). Demonstration that every limitation of the claim is literally met by the accused device must be shown by a preponderance of the evidence. *See Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 758, 221 U.S.P.Q. 473, 477 (Fed.Cir.1984).

### 1. Claim Construction

■ Claim construction is a matter of law and is reviewed by this court *de novo. See Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456, 46 U.S.P.Q.2d 1169,. 1174 (Fed.Cir.1998) (in banc); *Markman,* 52 F.3d at 979. Before the ITC, the parties' disagreement centered upon the limitation in claim 131 of the '039 patent which claims the step of "rotating the reference waveform by a selected power factor angle to yield a template waveform." In particular, the parties' primary dispute on appeal is over the construction of the word "rotating." The ITC concluded that the ordinary meaning of the term "rotating" in the context of the '039 patent was only a phase shift of the reference waveform.

Enercon argues that the term "rotating" is limited to a special type of phase shift that is disclosed in the written description of the '039·patent. All parties agree that the process of "rotating" a waveform results in a phase shift of the waveform in a plot against time. However, Enercon argues that the term "rotating" in claim 131 refers not to the generic process of phase shifting a waveform, but to a specific process used to perform the rotation known as a "rotational transformation." Enercon relies primarily upon the specification of the '039 patent to support its interpretation. Enercon asserts that because the only method disclosed in the specification for performing a rotation is a rotational transformation which is described as part of the preferred embodiment at col. 17, ll. 29–45 of the '039 patent, the term "rotating" must be limited to this method of performing the rotation. Enercon finally points to other, extrinsic sources which also purport to describe a rotation as a "transformation."

■ This court has repeatedly stated that while claims are to be construed in light of the specification, they are not necessarily limited by the specification. *See Markman,* 52 F.3d at 980. Claims terms are also to be interpreted so as to give the terms their ordinary meaning, absent some clear special definition. *See Vitronics,* 90 F.3d at 1582; *Athletic Alternatives v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578, 37 USPQ2d 1365, 1370 (Fed. Cir.1996). "Generally, particular limitations or embodiments appearing in the specification will not be read into the claims." *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867, 228 USPQ 90, 93 (Fed.Cir.1985); *SRI Int'l, Inc. v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 n. 14, 227 U.S.P.Q. 577, 585 n. 14 (Fed.Cir.1985) (in banc) (merely because "a specification describes only one embodiment does not require that each claim be limited to that one embodiment"); *Transmatic, Inc. v. Gulton Indus., Inc.,* 53 F.3d 1270, 1277, 35 U.S.P.Q.2d 1035, 1040–41 (Fed.Cir.1995) ("[A] patent claim is not necessarily limited to a preferred embodiment disclosed in the patent."). Enercon has shown no reason to depart from this well established rule.

Only in the preferred embodiment is the more specific "rotational transformation" procedure described as a method to rotate the waveform. The remainder of the specification uses the words "rotate" and "shift" interchangeably. As the ITC noted, NWP's chief technology officer also used the words "rotate" and "shift" interchangeably in de-

scribing the operation of the patented device. Even Enercon's own expert admitted that he had heard the terms used interchangeably.

We have also considered Enercon's extrinsic evidence purportedly demonstrating what the term "rotate" means to one of skill in the art and find it to be unhelpful at best and misleading at worst. Submitted as part of Enercon's claim construction argument, the Mohan, Ooi and Thorburg references make no mention of the disputed claim term. Not only does the text of the references not purport to aid in determining the meaning of the term "rotating," but the argument accompanying the citation of these references in Enercon's brief apparently attempts to show that several of the limitations of claim 131 can be found in the prior art. Because the validity of the '039 patent was not appealed to this court, these references may not be considered for that purpose.

As we have stated above, the specification clearly uses the terms "rotate" and "shift" interchangeably. In addition, all parties agreed that the phrase "rotating the reference waveform" indicates a shift in phase of the desired waveform. Because we see no evidence to indicate that the term "rotate" was intended to refer to the specialized method of performing a phase shift known as a "rotational transformation," we hold that the term "rotating" is to be given its ordinary meaning. We therefore hold that the ITC was correct in interpreting the term "rotating" to mean merely a phase shift in the desired waveform.

### 2. Reading Claims on the Accused Device

Literal infringement of a claim exists when every limitation recited in the claim is found in the accused device. See Strattec Security Corp. v. General Automotive Specialty Co., 126 F.3d 1411, 1418, 44 U.S.P.Q.2d 1030, 1036 (Fed.Cir.1997); Johnston v. IVAC Corp., 885 F.2d 1574, 1580, 12 U.S.P.Q.2d 1382, 1384 (Fed.Cir.1989) (citing cases). We review the ITC's determination that the accused device infringes properly construed claim 131 under the "substantial evidence in the record" standard as set forth at 5 U.S.C. § 706(2)(E) (1994) and mandated by 19 U.S.C. § 1337(c).

Enercon makes only one argument on appeal that it does not infringe claim 131 of the '039 patent under the ITC's claim construction. The ITC plainly considered this argument, but because Enercon failed to comply with discovery requests on this issue, the ITC found as a sanction that the Enercon device formed a "reference waveform" as required by claim 131. Enercon does not challenge the ITC's discovery sanction as an issue on appeal until the very end of its reply brief. As we have stated before, "[a] reply brief, which should 'reply to the brief of the appellee,' see Fed. R.App. P. 28(c), is not the appropriate place to raise, for the first time, an issue for appellate review." Amhil Enters. Ltd. v. Wawa, Inc., 81 F.3d 1554, 1563, 38 U.S.P.Q.2d 1471, 1477 (Fed.Cir.1996); see also Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800, 17 U.S.P.Q.2d 1097, 1103 (Fed.Cir.1990). Therefore Enercon has waived this issue on appeal and the question of whether the accused device forms a reference waveform has been established as a matter of law. Enercon does not appeal any other portion of the ITC's finding that the accused wind turbines infringe claim 131. Because we affirm the claim construction of the ITC, and Enercon did not properly appeal the finding of infringement based upon that claim construction, we affirm the ITC's determination that claim 131 is infringed.

### CONCLUSION

We hold that the ITC's interpretation of the jurisdictional provisions of section 337 is a reasonable construction of a statute which the ITC has the primary responsibility for implementing. Therefore, under Chevron, we must affirm this decision. We additionally affirm the decision of the ITC that the jurisdictional prerequisites of section 337 have been met in this case. With respect to literal infringement of the '039 patent, we affirm the ITC's construction of claim 131 which interprets the term "rotate" to mean a

"phase shift" of the desired waveform. Finally, because Enercon did not properly appeal the ITC's finding of infringement based upon this claim construction, we also affirm that decision. The decision of the ITC is therefore

*AFFIRMED.*