GENERAL ELECTRIC COMPANY,
Plaintiff–Appellant,

v.

NINTENDO COMPANY, LTD. and
Nintendo of America, Inc.,
Defendants–Appellees.

No. 98–1089.

United States Court of Appeals,
Federal Circuit.

June 2, 1999.

Matthew D. Powers, Weil, Gotshal & Manges, LLP, of Menlo Park, California, argued for plaintiff-appellant. With him on the brief were Edward R. Reines and Steven S. Cherensky.

Thomas G. Gallatin, Jr., Latham & Watkins, of New York, New York, argued for defendants-appellees. With him on the brief were John J. Kirby, Jr., Robert J. Gunther, Jr., and James S. Blank. Of counsel on the brief were Charles P. Baker, Robert H. Fischer, and Michael P. Sandonato, Fitzpatrick, Cella, Harper & Scinto, of New York, New York.

Before NEWMAN, MICHEL, and PLAGER, Circuit Judges.

MICHEL, Circuit Judge.

Plaintiff–Appellant General Electric Company ("GE"), the patent owner, appeals from the United States District Court for the District of New Jersey's grants of summary judgment to Defendants–Appellees, Nintendo Company, Ltd. and Nintendo of America, Inc. (collectively "Nintendo"), the accused infringers, terminating GE's infringement action. *See General Elec. Co. v. Nintendo Co.,* 983 F.Supp. 512 (D.N.J.1997). GE is the assignee of three patents: United States Patent No. 4,097,899 ("the '899 patent"), United States Patent No. 4,169,659 ("the '659 patent"), and United States Patent No. 4,279,125 ("the '125 patent"). All three of these patents are directed to television control circuitry. GE brought the instant action before the district court, claiming infringement of all three patents by three systems manufactured and sold by Nintendo. Nintendo counterclaimed that the '899 patent was invalid as anticipated, or at least rendered obvious, by a previously published Japanese patent application. The district court granted summary judgment for Nintendo of no infringement of any of the three GE patents and of invalidity for anticipation of the '899 patent. The appeal was submitted for our decision following oral argument on October 8, 1998. We affirm the grant of summary judgment of no infringement, literal or equivalent, of any of GE's three patents by any of Nintendo's three accused systems. We reverse the judgment of invalidity for anticipation as legally incorrect.

## BACKGROUND

GE filed this patent infringement action in the district court on March 17, 1995 alleging infringement of the '899 patent, the '659 patent and the '125 patent by Nintendo's video game systems (specifically the Nintendo Entertainment System ("NES"), the Super Nintendo Entertainment System ("SNES"), and the Gameboy). The '899, '659 and '125 patents pertain generally to electronic control circuitry used in connection with television systems. The '899 patent describes a switch to allow users of a television to switch between a signal from a television antenna, and a signal from a video record player, a video cassette recorder ("VCR"), or the like. The '659 patent is directed to a synchronization signal generator for use in video source equipment such as television cameras and video record players. The '125 patent is directed to devices for retrieving stored picture information from the memory of a computer and displaying that information on a standard television screen or other display device, e.g., a monitor. The NES and SNES systems are video game systems that display their games on television monitors. The Gameboy is a hand-held video game system with a built-in screen display.

Nintendo filed summary judgment motions asserting non-infringement by each of its products of the three patents-in-suit and further asserting that Claims 12 through 14 of the '899 patent, all the asserted claims, were invalid. The district court examined the claim language, the written description, the prosecution history, and extensive written submissions, including depositions and affidavits in arriving at its decision. No oral evidence was submitted and no hearing occurred. In a 153–page opinion issued on October 6, 1997, the trial court granted Nintendo each of the summary judgments it sought. *See General Elec. Co. v. Nintendo Co.,* 983 F.Supp. 512 (D.N.J.1997). The court also granted summary judgment of invalidity for anticipation of the '899 patent, but did not rule on a related counterclaim for a declaratory judgment of invalidity for obviousness. For a detailed account of the facts, the reader is referred to the district court opinion. Only those facts material to

our decision are discussed in this opinion. GE timely appealed from all aspects of that judgment in the instant case. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).

## DISCUSSION

We review a district court's grant of summary judgment de novo. *See Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315, 47 USPQ2d 1272, 1275 (Fed.Cir.1998). Summary judgment is properly granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In determining whether there is a genuine issue of material fact, the evidence must be viewed in the light most favorable to the party opposing the motion, with doubts resolved in favor of the opponent." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1307, 46 USPQ2d 1752, 1755 (Fed.Cir.1998).

 Infringement is a factual inquiry. *See Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1582, 34 USPQ2d 1120, 1126 (Fed.Cir.1995) ("[I]nfringement . . . is a question of fact."). Invalidity for anticipation, likewise, is a factual inquiry. *See Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302, 36 USPQ2d 1101, 1103 (Fed.Cir.1995) ("Anticipation is a question of fact."). Despite being issues of fact, infringement and anticipation may still be decided on summary judgment. To review the several summary judgments of no infringement and of invalidity for anticipation, however, we need to determine de novo whether the evidence in the record raises any genuine disputes about material facts. An evidentiary dispute is genuine if a jury could decide the issue either way, and its verdict would survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

We discuss the issues concerning each patent in turn.

## I. United States Patent No. 4,097,899

### A. Infringement Background

The '899 patent is directed towards a switch which allows the user of a television monitor to switch between video information received from an antenna and other sources of video information, for example, a video record player, when the user turns on or off the power to the alternative source. GE alleges that one or another of Nintendo's video game systems infringes each of Claims 12, 13 and 14 of the '899 patent. Claims 13 and 14 are dependent on Claim 12. Claim 12 provides:

> Video record player apparatus comprising:
>
> a player RF signal input terminal;
>
> a player RF signal output terminal;
>
> a player power supply developing supply potentials when selectively enabled;
>
> means, rendered operative in response to supply potential development by said power supply, for forming a player output signal inclusive of picture carrier frequency oscillations and sound carrier frequency oscillations;
>
> means, responsive to supply potential development by said player power supply, for establishing a first signal path between said output signal forming means and said player RF signal output terminal; first signal path

being disrupted in the absence of supply potential development by said player power supply; and

means, responsive to the absence of supply potential development by said player power supply, for establishing a second signal path between said player RF signal input terminal and said player RF signal output terminal; said second signal path being disrupted in the presence of supply potential development by said player power supply.

'899 pat., col. 9–10, ll. 62–17.

Claim 12 is directed to a switch that directs RF signals (signals in the radio frequency range) from the video record player to the television receiver, while disrupting the flow of broadcast signals from the antenna to the television receiver, when the video record player is on. The patent claim recites a system with two signal paths, one between an "RF signal output terminal" (television) and an "output signal forming means" (video record player), and one between an "RF signal output terminal" (television) and a "signal input terminal" (television antenna). Each of these signal paths has a switch on it. If the switch is closed, then the signal can flow freely along the signal path. If the switch is open, then the signal path is disrupted and there is no path for the signal to travel. When the system operates as recited in the claim, one switch is open and one switch is closed. If the video record player is turned off, the switch between the video record player and the television is open, and the switch between the antenna and the television is closed, thus disrupting the signal between the video record player and the television. If the video record player is turned on, then the switches flip; the signal path between the antenna and the television is disrupted; and the switch between the television and the video record player is closed, allowing the signal to flow from the player to the television. This allows the television to display whatever the viewer wants to see—the signal from the antenna when the video record player is off, or the signal from the video record player if the video record player is on.

The dispute relates to the switch between the antenna and the television. As described in the '899 written description, the path between the antenna and the television contains an electromagnetic relay in series, and between the antenna and relay is a diode, which is shunted to ground. When the video record player is turned off, the relay is closed, the diode is nonconductive, and the signal flows from the antenna to the television. When the video record player is turned on, the relay is open, the diode is conductive, and the signal path from the antenna to the television is bypassed and disrupted.

The alleged infringing products, the Nintendo systems, do not disrupt the signal path. The accused systems control the signal flow through three transistors. When the Nintendo systems are turned on, the transistors enter saturation, passing the signal from the antenna to ground. When the Nintendo systems are turned off, the transistors leave saturation, and the signal passes from the antenna, past the transistors, to the television.

### B. Infringement Discussion

Claim 12 of the '899 patent contains several limitations written in means-plus-function language. It can only be literally infringed if every such means limitation of that claim is found in Nintendo's accused devices.[1] Furthermore, to find literal infringement of a section 112, ¶ 6 limitation, the fact-finder must deter-

---

1. Section 112, paragraph 6 of the 1952 Patent Act states:

An element in a claim for a combination may be expressed as a means or step for

mine whether the accused device performs an identical function to the one recited in the means-plus-function clause.... If the identical function is performed, the fact-finder must then determine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents.

*Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211–12, 48 USPQ2d 1010, 1015–16 (Fed.Cir.1998) (citations omitted). At issue in the instant appeal is whether the accused Nintendo devices perform the identical function as the one recited in the last limitation of Claim 12:

> means, responsive to the absence of supply potential development by said player power supply, for establishing a second signal path between said player RF signal input terminal and said player RF signal output terminal; said second signal path being disrupted in the presence of supply potential development by said player power supply.

'899 pat., col. 10, ll. 11–17.

Nintendo argues that its systems do not disrupt the signal path, while the switch disclosed in the written description of the '899 patent does. Nintendo points to language in the written description that differentiates between the functions of disrupting (i.e., establishing a high series impedance), and bypassing (i.e., by creating a path of lower resistance). See '899 pat., col. 1, ll. 59–61 ("the first signal path is disrupted by the relay opening" as compared to being "bypassed by the second

conducting diode"); see *also* '899 pat., col. 4, ll. 7–10 ("the extremely low impedance shunt path formed by conducting PIN diode 66, ... and by virtue of the high series impedance established by opening of relay 50."). According to *Multiform Desiccants Inc. v. Medzam Ltd.,* " § 112 ¶ 6 facilitates the mechanics of claiming, by permitting the use of functional terms in claims while incorporating, from the specification, the breadth as well as the details of how the function is performed." 133 F.3d 1473, 1479, 45 USPQ2d 1429, 1434 (Fed.Cir.1998); *cf. Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2D 1321, 1330 (Fed.Cir.1995) (*in banc*), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) ("For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims."). We agree with Nintendo the written description of the '899 patent clearly distinguishes between the functions of disrupting and bypassing. We conclude, moreover, that the claim language "said second signal path being disrupted" means to establish a high series impedance in said signal path.[2] We thus agree with the district court's acceptance of Nintendo's argument that a reasonable jury could only find that the Nintendo systems do not disrupt the signal path between the antenna and the television. Therefore, because the Nintendo systems bypass the signal path between the antenna and the television, establishing an alternative path of lower resistance allowing the antenna signal to flow to ground rather than to the television, the Nintendo systems do not

---

performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

It is therefore possible to infringe a means-plus-function claim literally with a structure, material, or act that is not actually described in the specification, but is, instead merely its equivalent.

**2.** The '899 patent uses the terms "first" and "second" signal paths inconsistently. In the written description the antenna/television path is called the "first signal path." '899 pat., col. 1, ll. 47, 59. In Claim 12 it is called the "second signal path." '899 pat., col. 10, ll. 4–17. In both places, however, it is clear which path is being referenced. *Aff. of James K. Roberge,* ¶ 19, n. 3 (Jan. 15, 1996).

perform the identical function recited in means-plus-function language in the last limitation of Claim 12. In short, they do not disrupt the signal path. We, therefore, do not need to determine whether the accused devices use the same structure as described in the written description of the '899 patent or its equivalent. Since the accused devices do not perform the identical function to that of Claim 12 of the '899 patent, the accused devices cannot literally infringe independent Claim 12, or dependent Claims 13 and 14 of the '899 patent.

The accused systems can, however, infringe the '899 patent, under the doctrine of equivalents, if, *inter alia,* they perform an equivalent function to the disruption function claimed in the last means-plus-function limitation in Claim 12. However, disrupting the signal path results in an alteration of the signal path, whereas bypassing the signal path does not. We, therefore, agree with the district court, that no reasonable jury could find that an equivalent function (substantially similar or substantially the same function) is performed in the accused systems.

### C. Invalidity Background

Nintendo raised the issue of invalidity in its answer to GE's original complaint, in which Nintendo counterclaimed for a declaratory judgment that the '899 patent was invalid for failing to meet one or more of the conditions for patentability specified in 35 U.S.C. §§ 102 and 103. It then moved for summary judgment of invalidity, which was granted by the district court, but only as to anticipation. See *General Elec. Co. v. Nintendo Co.,* 983 F.Supp. 512, 534 (D.N.J.1997) ("[T]he Court finds by clear and convincing evidence that Sharp II anticipates '899 patent Claims 12–14. No genuine issue of material fact exists and summary judgment on this ground is likewise appropriate."). The court did not rule on obviousness.

■ Even though we conclude that the '899 patent is not infringed, however, we nevertheless must still review the holding of invalidity for anticipation of the '899 patent. See *Cardinal Chemical Co. v. Morton International, Inc.,* 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). *Cardinal* held that "[t]hough the decision of non-infringement disposes of the bill and answer, it does not dispose of the counterclaim which raises the question of validity." *Id.* at 94, 113 S.Ct. 1967. Therefore, our affirmance of a district court's judgment of noninfringement does not, by itself, moot the declaratory judgment claim of invalidity. *Id.* at 102–03, 113 S.Ct. 1967. Accordingly, if we do not address the ruling on validity, we deprive the "patentee of the appellate review that is a component of the one full and fair opportunity to have the validity issue adjudicated correctly." *Id.* at 102, 113 S.Ct. 1967.

Nintendo alleged that Japanese Patent Application SHO 49–7211 (the "Sharp II application"), published September 3, 1975, anticipated, or at least rendered obvious, the invention of the '899 patent. The district court granted Nintendo summary judgment, finding that every limitation of Claim 12 was "anticipated" by the Sharp II application as read by one of ordinary skill in the art at the time of the '899 patent's filing. See *General Elec.,* 983 F.Supp. at 534. Although obviousness was raised by Nintendo, it was never ruled on, and we, therefore, do not address that issue here.

### D. Invalidity Discussion

■ A judgment of invalidity for anticipation requires that a single prior art reference disclose every limitation in a patent claim. See *PPG Industries, Inc. v. Guardian Industries Corp.,* 75 F.3d 1558, 1566, 37 USPQ2d 1618, 1624 (Fed.Cir. 1996) ("To anticipate a claim, a reference must disclose every element of the challenged claim and enable one skilled in the

art to make the anticipating subject matter."). The '899 patent claims a switch that allows a television to receive audio and video signals from the antenna, and then to switch automatically to receive a signal from the video record player when the video record player is turned on by the user. The switch taught in the Sharp II application does not specifically disclose sending audio and video signals to the television when the video record player is turned on, much less doing so automatically. Nintendo does not argue that this element is expressly recited in, or even taught by, the Sharp II application, but rather states that "a skilled artisan reading the Sharp II reference would immediately understand that the RF converter generates carrier signals as soon as it is turned on." Defs–Appellees' Br. at 35. It is undisputed that this limitation of the '899 patent claims is not disclosed by the Sharp II application. It was incorrect, therefore, to hold the '899 patent invalid for anticipation based on the Sharp II application, unless this element was proven to be inherent in the recitation of Sharp II. But it was not. Accordingly we reverse this part of the judgment.

## II. United States Patent No. 4,169,659

### A. Infringement Background

The '659 patent describes a technology for generating timing information for use by video source equipment such as television cameras and video tape recorders. Televisions display pictures as a series of frames, which consist of a fixed number of lines, which in turn consist of a number of pixels (or picture elements). The pixels are transmitted to the television receiver along with timing information which, in effect, associates a position on the television screen with each pixel. The timing information tells the television receiver when to end each line and begin painting a new line and when to end each frame and return to the top of the screen to begin a new frame. The '659 patent relates to the horizontal and vertical counters, which determine the location of each pixel on the television screen.

There are two independent claims at issue—Claims 1 and 4. The parties agree that the same phrases are at issue in both claims, and agree that the terms should be interpreted the same way in each claim. We, therefore, address the terms, rather than the individual claims, in our discussion below. It is undisputed that the two key phrases are: "drive signals" and "clocked by a signal which is advanced in phase." [3]

### B. Infringement Discussion

In order to infringe the '659 patent literally, the accused Nintendo systems must meet all of the limitations of the asserted

---

3. Claim 1 reads:

A television synchronizing signal generator comprising:

a source of clock pulses;

a synchronous horizontal counter responsive to said clock pulses from said source for producing signals having frequencies which are integral multiples of the horizontal line frequency of the television signal;

a vertical counter coupled to an output of said synchronous horizontal counter for producing signals having frequencies which are integral divisions of twice the line frequency of the television signal, said vertical counter being clocked by a signal which is advanced in phase relative to the lowest frequency signal produced by said synchronous horizontal counter;

output means for generating blanking, sync and drive signals;

gating means coupled to said synchronous horizontal counter and said vertical counter for conditioning said output means for the generation of said blanking, sync and drive signals; and

means for rendering said output means responsive to said clock pulses so that said blanking, sync and drive signals are phase-related to said clock pulses.

'659 pat, col. 18, ll. 40–64

claims. The parties only dispute two issues: whether the accused systems produce drive signals as defined in the '659 patent; and whether they contain vertical counters "clocked by a signal which is advanced in phase." Nintendo argues the accused systems do neither.

■ First, Nintendo argues that the definition of "drive signals" is unclear from the claim language. It is true that the term "drive signal" is a fairly generic term of art. However, the language of the claims in the '659 patent limits the claimed "drive signals" to those "phase-related to said clock pulses." '659 pat., col. 18, l. 64. Nintendo argues that we must look to the written description for a further definition of the claim limitation "drive signals." In particular, Nintendo argues that "drive signals" are defined in the '659 written description as:

> The HORIZONTAL DRIVE/CHROMA signal is produced during each horizontal synchronizing interval and is used to trigger the horizontal deflection circuitry in the *television camera* . . . .

> The VERTICAL DRIVE signal is used to trigger the vertical deflection circuitry in the *television camera.*

'659 pat., col. 6–7, ll. 56–46 (emphasis added). We hold that the meaning of the term "drive signals," as claimed in the '659 patent, is broader and is clear from the language of the claims. The phrases cited by Nintendo above are not a definition of the term "drive signal." Nintendo is, essentially, arguing that we should import one example from the written description into the claims as the complete definition of a claim term. This we cannot do, as "what is patented is not restricted to the examples, but is defined by the words in

the claims. . . ." *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987, 6 USPQ2d 1601, 1604 (Fed.Cir.1988). The passage from the '659 written description quoted above is but one example of the use of a drive signal, and is not a further limitation to be imported into the claims. The words in the claims do not specify a television camera, and Nintendo's argument that the accused systems, lacking a television camera, cannot infringe is therefore incorrect. The accused systems clearly do produce drive signals as contemplated by the claim language.

■ The accused systems, however, cannot literally infringe the '659 patent claims unless they also have vertical counters "clocked by a signal which is advanced in phase." The Nintendo systems work by generating a signal called the HCLD signal and sending it through the input line of the vertical counter. It is undisputed that this signal is "advanced in phase." However, in accordance with the technical definition of the term "clock," in order for the vertical counter to be "clocked," the signal must go through the clock line. Nintendo's devices, however, send the signal through the input line, and not the clock line. The HCLD signal thus does not clock the vertical counter. Therefore, no reasonable juror could find literal infringement.

There is still, however, the possibility of equivalent infringement. Nintendo moved for summary judgment, which was granted, of no literal or equivalent infringement by the accused devices of the '659 patent claims. In opposing Nintendo's summary judgment motion, GE argued only the first issue discussed above, that the Nintendo systems infringed, literally and equivalently, with or without a television camera.[4]

---

4. There were two possible arguments to be made that the Nintendo systems equivalently met the particular claim element of the '659 patent. GE focused solely on the "advanced in phase" portion of the claim element and

did not argue before the district court, or this court, that by sending the signal through the input line, the Nintendo systems equivalently infringed the "clocked" limitation of the claim. Nor did it present any evidence at all

Under *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), GE has the burden of presenting enough evidence so that a reasonable jury could conclude that the alleged Nintendo systems infringe the '659 patent under the doctrine of equivalents. This burden means GE had to present evidence that every limitation of the '659 patent, including "clocked," is met, at least under the doctrine of equivalents, by the alleged Nintendo systems. In *Celotex*, the Supreme Court explained that:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* GE then had the burden of presenting enough evidence that a reasonable jury could conclude that the clocked limitation was met under the doctrine of equivalents in the accused systems. GE failed to "make a showing sufficient to establish the existence of [the] element." [5] *Id.* at 322, 106 S.Ct. 2548. This failure to present evidence that this limitation of the '659 patent is met by the alleged Nintendo systems renders summary judgment of non-infringement was appropriate on this record and accordingly we affirm that judgment.

### III. United States Patent No. 4, 279,-125

#### A. Infringement Background

The '125 patent is directed towards a method for displaying computer generated information on a display screen, such as a television or other device. A standard computer uses a Central Processing Unit ("CPU") to transfer data. The '125 patent discloses direct memory access ("DMA") capability, which allows the computer to transfer data without the intervention of the CPU. The '125 patent describes a method of transferring images from the computer's memory to the screen without using the CPU. GE alleges that Nintendo's systems infringe Claim 1 of the '125 patent.

#### B. Infringement Discussion

Nintendo makes three arguments that the accused systems do not infringe the '125 patent.

---

to support the idea that sending the signal through the input line equivalently meets the "clocked" limitation.

5. GE's entire argument in its briefs before this court is:

Nintendo claimed that its vertical counter is not literally clocked by the HCLD pulse, which is unquestionably advanced in phase. If it is found that Nintendo does not literally meet this limitation because of this form-over-substance argument, this is a classic example of substantial equivalence.... [T]he "advanced in phase" HCLD enable signal achieves the same precision timing as the advanced-in-phase signal specifically described in the '659 Patent and is substantially equivalent thereto.... Again, where

a DOE argument is so strong and supported by substantial evidence, it is improper for the trial court to have granted summary judgment on this fact question. Pl.-Appellant's Br. at 34. This conclusory assertion of equivalence is insufficient to establish a genuine issue of material fact and GE therefore fails to carry its burden under *Celotex* because it points to and produced no evidence that the counter in the accused systems is "clocked" by the signal when the signal is not even input to the clock line, but the input line. Nowhere in the record below did GE cite evidence to the district court establishing such equivalence. Nor does it here.

First, Nintendo argues that its systems do not use the conventional DMA[6] circuit taught by the '125 patent and positively recited in Claim 1.[7] GE counters that the Nintendo systems use hardware, and not the CPU, to transfer data, and that this is a DMA circuit. Nintendo's response is that the dedicated hardware is completely separate from the CPU and, thus, is not the conventional DMA circuit disclosed by the '125 patent. The DMA circuit, we conclude, is not part of the structure in the written description that corresponds to the "first decoder means" or any other means recited in the claim. '125 pat., col. 8, l. 10. The "first decoder means" supplies the DMA requests, but does not make the requests itself. '125 pat., col. 8, l. 10. Because the DMA circuit is not part of a means-plus-function limitation, GE's infringement claims are not limited to the DMA circuit structures described in the written description and their equivalents. Nintendo admits that the accused systems use dedicated hardware, completely separate from the CPU, to transfer the data, i.e., make DMA requests. A reasonable jury could find that the Nintendo systems operate in this manner, and therefore make DMA requests, as recited in Claim 1.

Second, Nintendo argues that the Nintendo systems are missing a specific gating structure required by the '125 patent and that they therefore do not infringe

6. A DMA circuit is hardware dedicated to transferring data (in this case from the memory to the display) without use of the CPU.

7. Claim 1 reads:

A system for displaying a pattern on a raster scanned display device by mapping bits from a display location in a memory associated with a computer onto the raster as contrasting spots depending on the value of each bit, wherein said computer is responsive to a direct memory access request to produce on a data bus, data signals retrieved from said memory at a location specified by a pointer address register, comprising the combination of:

clock means for producing timing signals;

output means for coupling signals to said display device;

means, including interval timing means, responsive to said timing signals, for producing horizontal synchronizing signals and applying them to said output means;

line counter means responsive to said horizontal synchronizing signals for producing output signals identifying individual horizontal lines;

*first decoder means responsive to said interval timing means and to said line counter means for supplying direct memory access requests to said computer;*

second decoder means responsive to said line counter means for supplying vertical synchronization signals to said output means;

means for storing data signals from said data bus in response to a signal derived from said timing signals when said computer responds to a direct memory access request and for shifting said data serially to said output means in response to said timing signals; and

a plurality of gating means, responsive to a command signal, for coupling the output signals from the line counter means to the data bus means.

'125 pat., col. 7–8, ll. 51–24 (emphasis added).

8 This is a character, comprised of twelve bits. A bit mapping system could modify this character and display it in many different ways -- it sees this solely as a collection of twelve bits. A character generating system, by contrast, sees this as the letter "V," and can alter it in no way.

the '125 patent. The specific language of Claim 1 reads: "a plurality of gating means, responsive to a command signal, for coupling the output signals from the line counter means to the data bus means." '125 pat., col. 8, ll. 22–24. This is means-plus-function language, and so the question becomes: "Do the Nintendo systems contain a gating structure, or its equivalent, as found in the specification?"

Nintendo argues that the one and only structure in the written description corresponding to this means clause is a very specific circuit arrangement in which the five highest stages of the line counter are connected to the data bus by a set of AND gates. GE counters that the gating means in the above structure are the actual AND gates which connect the stages of the line counter to the data bus. GE states that the claim calls for a plurality of gating means, that the only plurality in the circuit as described in the written description is the AND gates, and that the single structure is just that, a single structure. Furthermore, per GE, the language in the claim and the language in the specification parallel to the point that the gating means would have to be the AND gates. We agree.

The Nintendo systems also couple the line counter to the data bus. The systems use a tri-state buffer as a gating means to couple the line counter to the data bus. The AND gate of the '125 patented invention has been replaced in the Nintendo systems by the tri-state buffer. An AND gate has two states: on and off. A tri-state buffer is, essentially, an AND gate with a third state: neutral. They both, as specified in the claim and as used in the accused systems, couple the line counter to the data bus. It is uncontroverted that they are interchangeable for this purpose. The Nintendo systems, therefore, are not missing the gating structure required by the claim.

■ Nintendo's third and final argument in support of the finding as a matter of law of no infringement of the '125 patent is that Claim 1 requires a bit map display device, and the Nintendo systems do not meet this limitation. The threshold question here is whether a bit map display device is a limitation on Claim 1. The only reference made in Claim 1 to a bit map display device is in the preamble: "A system for displaying a pattern on a raster scanned display device by mapping bits from a display location in a memory associated with a computer onto the raster." '125 pat., col. 8, ll. 25–28. We must, thus, determine whether the preamble breathes life and meaning into the claim, and is incorporated by reference because of language appearing later in the claim, making it a limitation of the claim. *See In re Paulsen*, 30 F.3d 1475, 1479, 31 USPQ2d 1671, 1673 (Fed.Cir.1994) ("Terms appearing in a preamble may be deemed limitations of a claim when they 'give meaning to the claim and properly define the invention.'") (quoting *Gerber Garment Technology, Inc. v. Lectra Systems, Inc.,* 916 F.2d 683, 688, 16 USPQ2d 1436, 1441 (Fed.Cir. 1990)).

> No litmus test can be given with respect to when the introductory words of a claim, the preamble, constitute a statement of purpose for a device or are, in themselves, additional structural limitations of a claim. To say that a preamble is a limitation if it gives "meaning to the claim" may merely state the problem rather than lead one to the answer. The effect preamble language should be given can be resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim.

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251, 1257, 9 USPQ2d 1962, 1966 (Fed.Cir.1989). Here, the '125 specification makes clear that the inventors were working on the particular problem of displaying binary data on a

raster scan display device and not general improvements to all display systems. In light of the specification, to read the claim indiscriminately to cover all types of display systems would be divorced from reality. The invention so described is restricted to those display devices that work by displaying bits, which is not true with respect to all display systems recited in just the body of the claim. "Thus, we conclude that the claim preamble in this instance does not merely state a purpose or intended use for the claimed structure. Rather, those words do give 'life and meaning' and provide further positive limitations to the invention claimed." *Id.*

The claim, therefore, recites a bit-map display device, and so we must determine whether the Nintendo systems display images by mapping bits. The Nintendo systems, as do any raster scan devices, create pictures on the screen by making pixels either light or dark, depending on the memory of the computer. The Nintendo systems, however, generate characters (e.g., the letter "V"), which are fixed compilations of bits, while the system described in the '125 patent creates pictures bit by bit (e.g., a dot in the middle of the letter "V").[8] A character generating system is thus limited in its display capability to the characters stored in its memory, while a bit mapping system is limited only by the number of bits displayable on the screen at any one time.

> The memory mapped approach [bit mapping] requires relatively simple hardware but extensive memory and software processing, whereas in the block or object approach [character generation], memory is saved by using more complex hardware. . . . [I]n the object oriented display, the objects are moved by simply changing the display addresses. . . . In the memory mapped approach, however, moving one pattern from one location to another involves considerable software processing on the refresh memory.

*General Elec.*, 983 F.Supp. at 558.

During the prosecution of the '125 patent, the prosecuting attorney distinguished the '125 patent from a prior art reference that used a character generation display system. In doing so, the attorney stated the following:

> [The '125 patent] synchronizes the operation of a computer's direct memory access with the display device and displays the data as taken from the memory onto the display. On the other hand, the system of Reference A . . . reads a character from memory in the form of binary bits, decodes the character into a matrix of dot elements, and then displays the dot matrix to provide the configuration of the character. The circuit of Reference A is thereby restricted only to characters which are coded into stored binary values and capable of being generated by the character generator, whereas the system of the ['125 patent] can display any desired configuration of dots.

Based on the above, we agree with Nintendo that the character generating system used in the Nintendo systems is significantly different from the bit-map display device claimed in the '125 patent. The Nintendo systems are, in fact, missing the bit-map display device required by the '125 patent, having no ability to display anything smaller than a character, or grouping of bits, on their display devices, and therefore the accused systems cannot literally infringe.

■ "Interpreting claims in view of the prosecution history applies as a preliminary step in determining literal infringement. Prosecution history estoppel applies as a limitation to the doctrine of equivalents after the claims have been properly interpreted and no literal infringement is found." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870, 228 USPQ 90, 96 (Fed.Cir.1985). As can be seen in the above discussion of the prosecution history of the '125 patent, prosecution history estoppel here prevents the accused product from being deemed to contain any

element identical or equivalent to the bit map limitation in the '125 patent claims. The patentee waived coverage of character generating systems by the '125 patent during prosecution. "The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of that patent." *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951–52, 28 USPQ2d 1936, 1939 (Fed.Cir.1993). Without this element, there can be no equivalent infringement.

## CONCLUSION

The Nintendo systems clearly do not disrupt the signal paths between the signal input and output centers as required by the '899 patent claims and, therefore a limitation is entirely missing in the accused devices, and no reasonable juror could find literal or equivalent infringement of the '899 patent. Neither do the Nintendo systems contain a vertical counter "clocked by a signal which is advanced in phase," as required by the '659 patent claims. Therefore, no reasonable juror could find literal infringement of the '659 patent. As to infringement under the doctrine of equivalents of the '659 patent claims, GE failed to present evidence that every limitation of the '659 patent not literally met, specifically "clocked," was equivalently met by a corresponding feature of the accused Nintendo systems. GE, therefore, failed to carry its burden of presenting sufficient evidence that a reasonable jury could find that there was equivalent infringement of the '659 patent claims. Finally, the Nintendo systems, indisputably, do not utilize a bit-map display device, or its equivalent, as claimed in the preamble to the asserted claim of the '125 patent, and clarified in the prosecution history, because they can only generate whole characters, and not individual bits, and, thus as a matter of law, there is no infringement, literal or equivalent, of the '125 patent.

We, therefore, affirm the grants of summary judgment of no infringement as to all asserted claims of each of the three patents at issue in the instant case. There are, however, genuinely disputed issues of material fact, as to whether a particular limitation, e.g., sending audio and video signals to the television automatically when the video record player is turned on, was known in the art at the time of the '899 filing, and the background knowledge held by one skilled in the art at the time of the '899 filing. Nintendo and GE each presented expert testimony that suggested different answers to these questions. This genuine dispute would seem to preclude summary judgment of invalidity of the '899 patent for obviousness over the Sharp II application. In any event, the district court did not reach this issue, and so neither do we. The court's judgment of invalidity for anticipation is reversed as legally incorrect, because it is undisputed that the limitation recited in the '899 claims of sending audio and video signals to the television automatically when the video record player is turned on is not disclosed by the Sharp II application.

The judgment, therefore, is

*AFFIRMED–IN–PART, and RE-VERSED–IN–PART.*

## COSTS

Each party shall bear its own costs.